Filed 6/26/13  Alward v. Alward CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

| | |
|---|---|
| MICHAEL ALWARD, | C069645 |
| Plaintiff and Appellant, | (Super. Ct. No. 10CVPB0026534) |
| v. | |
| ROBERT ALWARD, as Trustee, etc., | |
| Defendant and Respondent. | |

Charles Alward died in 2009, and was survived by his two sons, Michael Alward and Robert Alward.[1]  Approximately six months before his death, Charles executed a new will and an amendment to his 1986 trust agreement.  The effect was to disinherit Michael and to remove him as a successor trustee.  Michael brought this proceeding to declare the trust amendment invalid, to remove Robert as trustee, and for an accounting. The trial court entered judgment in favor of Robert, and specifically found that the trust

---

[1]    We shall refer to Charles, Michael, and Robert Alward by their first names, not from disrespect, but to avoid confusion.

1

amendment was valid, the 2009 will was valid, that Charles had the necessary testamentary capacity, and that Robert did not unduly influence Charles.

Michael argues: (1) that the 1986 trust was not subject to amendment, and (2) that Robert had the burden of proving he did not exercise undue influence over his father. There is no appellate challenge to the trial court's finding of testamentary capacity. We shall affirm the judgment of the trial court.

FACTUAL AND PROCEDURAL BACKGROUND

Charles and his wife, Dorothy, executed a trust agreement in 1986. Charles and Dorothy were the trustors and trustees of the trust. The agreement provided that "[d]uring such time as either Trustor is alive . . . the Trustee shall distribute from this fund to or for the benefit of the Trustors, or either of them, such sums at such times as the Trustor shall direct . . . ." The agreement stated that upon the death of both trustors, "[t]he balance of the trust estate remaining after any payments of expenses and taxes . . . shall be distributed to the Trustors' descendants who survive both Trustors, by right of representation." As indicated, Charles and Dorothy had two sons who survived them – Robert and Michael.

Two provisions of the trust agreement are crucial to this case. The first was Article I, paragraph B, of the trust titled "Amendment or Revocation," which stated:

> "During their joint lives, Trustors may, at any time and from time to time, by written notice signed by both of them and delivered to the Trustee, amend any of the provisions of this Agreement, revoke the trust in whole or in part, change beneficiaries or their respective shares of the plan of distribution, and substitute any Trustee acting hereunder, PROVIDED, HOWEVER, that the duties, powers and liabilities of the Trustee shall not be modified without the written consent of the Trustee."

The second paragraph – Article I, paragraph C – was titled "Irrevocability on Death." It stated:

> "At such time as neither Trustor is alive, the trust created by this Agreement shall become irrevocable and not subject to amendment."

2

The trust agreement also named Robert the successor trustee in the event of the death, resignation, or incapacity of both trustees, and named Michael the successor trustee should Robert be unable or unwilling to serve as trustee.

Dorothy died in 2000. In 2005 Charles executed an amendment to the trust agreement, which provided that Robert and Michael would serve as successor co-trustees in the event of his death, resignation, or incapacity.

In mid-February 2009, Charles moved from his home to an independent retirement community. The move was necessitated primarily by Charles's age, which was 94. His sons agreed that he should no longer be living alone. Charles and Rose Marie Boyce had begun dating in 2000, and Boyce sometimes stayed with Charles, first at his house and later at the retirement home. Boyce was 16 years younger than Charles.

During the move, Michael had an argument with Boyce. Charles witnessed the argument, during which Michael, who was holding a hammer in his raised hand, called Boyce a "spoiled fuckin' bitch," causing Boyce to say, "[d]on't you dare hit me." Michael told Boyce he wanted her out of the building, before walking out himself. The argument upset Charles.

Michael claimed that he cut off contact with his father after the argument with Boyce because he did not want Charles to have to make a choice between him (Michael) and Boyce. Charles tried to call Michael and reestablish communication. Michael returned only one of the phone calls, and that was to tell Charles that he would not visit him anymore. Charles continued to leave messages for Michael. Michael did not return the calls. Michael never had any further contact with his father.

Linda Fee, an employee at Charles's retirement home said she had never met Michael, but she had heard Charles refer to him as an SOB a couple of times. Another employee, Chuck Sanborn, stated Charles told him that Michael "never came to see him and as far as he was concerned he wasn't worth the powder to blow him to hell."

3

In April 2009, Charles told Robert he wanted to make some changes to his will. Robert told Charles to talk to his lawyer. After Robert, who lived in Hawaii, returned home, he had a phone conversation with his father in which Charles told him Steven Small, his estate attorney, was processing his request. Robert never spoke with Small, but he did speak over the phone to Dara Stead, Small's legal assistant. Stead sent Robert drafts of the changes to the will and trust by fax or email. Robert asked his father whether this was what he wished to do, and if he was aware of the ramifications. Charles said that he was. Robert was not in California when Charles executed the trust amendment and changes to his will on May 20, 2009.

Robert planned to have a 95th birthday party for Charles in November 2009. However, several days prior to the planned event, Charles fell and broke his neck. Charles was in a rehabilitation center for approximately 30 days. During that time Michael did not visit his father, although Michael's wife did visit Charles. On December 4, Charles was at the rehabilitation center recovering from his broken neck when he suffered a heart attack. Charles died on December 6, 2009.

DISCUSSION

I

The Trust was Revocable During Charles's Lifetime

Michael argues that the power to amend or revoke the trust was set forth in Article I, paragraph B, that said paragraph required the signature of both trustors, and that after one trustor died, the signature of both could no longer be obtained, rendering the trust irrevocable and not capable of amendment after such time. We disagree and conclude that the trust document taken as a whole cannot be so interpreted.

The terms of Article I, paragraph B, which provide in part that the trustors may amend the provisions of the trust agreement by written notice signed by both of them, are qualified by the beginning phrase of the paragraph, which limits the operative effect of the terms of the paragraph to the joint lives of the trustors. Thus, during the joint lives of

4

the trustors, they could amend the provisions of the trust, or revoke it, or change the beneficiaries, but only by written notice signed by both trustees. This paragraph says nothing about revocability or the ability of a surviving trustor to amend the terms of the trust after the death of one of the trustors.

Article I, paragraph C, states that the trust "shall become irrevocable and not subject to amendment" when neither trustor is alive. The logical inference is that the trust *is* revocable and subject to amendment *until such time*. Moreover, California law provides that a trust instrument is revocable by the trustor unless the trust instrument expressly provides that it is irrevocable. (Prob. Code, § 15400.) Here, the only trust provision that expressly makes the trust irrevocable applies at the time *both* trustors are deceased. The trust makes no express provision of irrevocability for the period of time when the surviving trustor is still alive. Therefore, by statute the trust is revocable during this period.

II
Michael's Burden to Prove Undue Influence

Michael argues the trial court erred when it concluded he had the burden of proving Robert exercised undue influence over Charles. The trial court was correct.

"Undue influence is pressure brought to bear directly on the testamentary act, sufficient to overcome the testator's free will, amounting in effect to coercion destroying the testator's free agency. . . . [¶] Although a person challenging the testamentary instrument ordinarily bears the burden of proving undue influence ([Prob. Code,] § 8252), . . . a presumption of undue influence, shifting the burden of proof, arises upon the challenger's showing that (1) the person alleged to have exerted undue influence had a confidential relationship with the testator; (2) the person actively participated in procuring the instrument's preparation or execution; and (3) the person would benefit unduly by the testamentary instrument." (*Rice v. Clark* (2002) 28 Cal.4th 89, 96-97.) To

5

shift the burden of proof, the challenger must establish proof of these three elements by a preponderance of the evidence. (*Estate of Gelonese* (1974) 36 Cal.App.3d 854, 862.)

The first element is the existence of a confidential relationship. The essence of a confidential relationship lies in the unequal positions of the parties. (*Richelle L. v. Roman Catholic Archbishop* (2003) 106 Cal.App.4th 257, 271.) " '[T]he person in whom trust and confidence is reposed and who accepts that trust and confidence is in a superior position to exert unique influence over the dependent party.' " (*Ibid*.) Whether a confidential relation exists is a question of fact that depends heavily on the circumstances. (*Id*. at p. 272, 273, & fn. 6.) The vulnerability of one party, whether from age, youth, weakness of mind, or some other incapacity, is a necessary predicate of a confidential relation. (*Id*. at p. 273.)

The parent-child relationship may, but does not necessarily result in a confidential relationship. It is insufficient to invalidate a will or trust unless there is also a showing of undue profit and active participation by the child in procuring the execution of the document. (*Estate of Gelonese, supra*, 36 Cal.App.3d at pp. 864-865.)

The trial court found that despite Charles's advanced age, he was not vulnerable, and remained fully capable of directing the distribution of his estate. A preponderance of evidence supported this conclusion. Two people witnessed the execution of Charles's will and trust. Dara Stead worked for Charles's attorney, Steven Small. She testified that when she witnessed the execution of the will and trust, she saw nothing that concerned her about Charles's mental capacity, and he did not appear to be influenced by anything other than his own wishes. Linda Fee, the other witness and an employee at the independent living facility, testified she asked Charles if he knew what he was signing, and if he was acting of his own free will. He stated that he was.

The only evidence of Robert's influence over Charles's testamentary intent was Robert's own testimony that when his father told him he wanted to make some changes to his estate, Robert advised Charles to talk to his attorney about it. Robert testified that

6

Charles contacted Small's office to make the changes, and Robert testified Small's office sent him (Robert) drafts of the amendments. Robert spoke with his father about the amendments, and Charles confirmed that they expressed his wishes. Robert had no participation in the execution of the documents, and Charles was aware that his lawyer was keeping Robert informed of the changes. Thus, there was not proof by a preponderance of the evidence that a confidential relationship existed between Robert and Charles.

The second element is the person's active participation in procuring the preparation or execution of the instrument. The trial court found that while there was some evidence of Robert's participation in his father's financial affairs, it was insufficient to prove that Robert's involvement resulted in the modification of the will and trust documents.

Securing an attorney for the purpose of preparing a will for the testator does not itself constitute participation in procuring the preparation or execution of the instrument. (*Estate of Llewellyn* (1948) 83 Cal.App.2d 534, 565.) This is particularly true where the proponent contacted the attorney at the request of the testator, and the attorney contacted was one who had done prior estate work for the testator. (*Ibid*.) If the evidence merely shows an opportunity to influence the testator coupled with an interest or motive to do so, this is insufficient to constitute the requisite participation. (*Id*. at p. 566.)

Here, there was evidence that Charles himself contacted his attorney about changing his will and trust. Although Robert reviewed the amendment sent to him by the attorney's office, he did so with Charles's knowledge. There is no evidence that is inconsistent with the amendments being the result of a voluntary act on the part of Charles. While it does appear that Robert facilitated the amendments to the will and trust by contacting the attorney and reviewing the draft amendments, there is no indication that his actions were inconsistent with Charles's wishes, or that his facilitation crossed the line into active participation.

The final element is undue profit. The trial court found no undue profit to Robert. What is undue "entails a qualitative assessment of the relationship between the decedent and the beneficiary." (*Estate of Sarabia* (1990) 221 Cal.App.3d 599, 607, superseded by statute on other grounds as stated in *Rice v. Clark*, *supra*, 28 Cal.4th 89.)

One consideration in determining undue profit is whether the provisions of the testamentary document are unnatural as to those excluded. (*Estate of Goetz* (1967) 253 Cal.App.2d 107, 117-118.) While it is true that Michael, being Charles's son, would be the natural object of his father's bounty, there was overwhelming evidence that the two were estranged. There was evidence that Michael argued with Boyce, that afterward he never again saw Charles, that Charles made futile attempts to reopen communications with Michael, and that Charles spoke harshly about Michael to others. These facts are sufficient to support the trial court's finding that Robert did not unduly profit from the will and trust.

For the same reasons, we would conclude there was no undue influence, even if it had been Robert's burden to rebut a presumption of undue influence. The estrangement of Michael and his father, coupled with the fact that Robert was not present when the will and trust were signed, and the fact that Charles was competent and knew his own wishes at the execution of the documents are more than sufficient to show that Charles's mind was not overpowered by Robert when the will and trust were executed. (See *Estate of Arnold* (1940) 16 Cal.2d 573, 577 [" 'The unbroken rule in this state is that courts must refuse to set aside the solemnly executed will of a deceased person upon the ground of undue influence unless there be proof of "a pressure which overpowered the mind and bore down the volition of the testator at the very time the will was made".' "].)

## DISPOSITION

The judgment is affirmed.  Respondent shall recover his costs on appeal.
(Cal. Rules of Court, rule 8.278(a).)


                                             __BLEASE__              , Acting P. J.


We concur:


    __NICHOLSON__         , J.


    __HOCH__             , J.

9